**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **DYLAN WOHNHAS**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**THE RASEVIC COMPANIES,**<br><br>Defendant. | Case No<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Dylan Wohnhas ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant The Rasevic Companies ("Defendant" or "Rasevic") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiff makes the following allegations upon information and belief, except as to his own actions, the investigation of their counsel, and facts that are a matter of public record.

## I. NATURE OF THE ACTION

1. This class action arises out of Defendant Rasevic's failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiff's and Class members' (defined below) sensitive personal identifiable information that it had acquired and stored for its business purposes.

2. Defendant has "served Maryland, Virginia, Delaware and the greater Washington D.C. area of the Mid-Atlantic region" with a variety of services including dust control and land development, snow removal, landscape and lawn maintenance service, professional holiday

decorating and building new custom homes and remodels existing homes."[1]

3. According to a "Notice of Data Incident" Defendant provided to Maine's Attorney General, a data breach occurred on its network between approximately March 28, 2025, and April 2, 2025, but remained, undiscovered, until April 2, 2025, (the "Data Breach").[2]

4. Due to Defendant's data security failures which resulted in the Data Breach, cybercriminals were able to target Defendant's computer systems and exfiltrate highly sensitive and personally identifiable information ("PII" or "Private Information") belonging to Plaintiff and Class members. As a result of this Data Breach, Plaintiff's and Class members' Private Information of remains in the hands of those cybercriminals.

5. Defendant's notice states that it "observed a network disruption event wherein an unauthorized actor gained access to our network."[3] Upon learning of the Data Breach, it began "working very closely with external cybersecurity professionals experienced in handling these types of incidents. Following the completion of our investigation, it was determined that some of our files may have been accessed or removed by the unauthorized individual(s) between March 28, 2025, and April 2, 2025. We conducted a thorough review of the potentially impacted data and on September 2, 2025, we determined that the impacted files may have contained your personal information."[4]

6. The investigation determined that copies of files containing customers' personal information from Rasevic's systems were accessed.[5] After learning of the Data Breach on or about

[1] https://www.linkedin.com/company/the-rasevic-companies/about/ (last visited October 8, 2025).
[2] https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3128 (last visited October 8, 2025). *See also* https://rasevic.com/wp-content/uploads/2025/10/Security-Incident-letterhead-10-2.pdf (last visited October 8, 2025).
[3] *Id.* n.2, *supra*.
[4] *Id.*
[5] *Id.*

April 2, 2025 and determining that Private Information was involved in the breach, Defendant delayed sending notices to the victims of the Data Breach (the "Notice of Data Incident Letters") until October 2, 2025.

7. The Private Information compromised in the Data Breach included current and former customers' Private Information, and was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiff's and Class members' Private Information with which it was entrusted for either Rasevic's services or employment or both.

8. Plaintiff brings this class action lawsuit on behalf of himself and all other similarly situated persons to address Defendant's inadequate safeguarding of Class members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class members that their information had been subject to the unauthorized access of an unknown third party and failing to include in that belated and inadequate notice precisely what specific types of information were accessed and taken by cybercriminals.

9. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that network in a dangerous condition.

10. Defendant disregarded the rights of Plaintiff and Class members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it

did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class members with prompt and full notice of the Data Breach.

11. In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its computer network and systems, it would have discovered the massive intrusion sooner rather than allowing cybercriminals almost a month of unimpeded access to Plaintiff's and Class members' Private Information.

12. Plaintiff's and Class members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

13. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including: opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' information, filing false medical claims using Class members' information, obtaining driver's licenses in Class members' names but with another person's photograph, and giving false information to police during an arrest.

14. As a result of the Data Breach, Plaintiff and Class members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

15. Plaintiff and Class members may also incur out of pocket costs for, *e.g.*, purchasing

credit monitoring , credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all other similarly situated individuals whose Private Information was accessed during the Data Breach.

17. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring funded by Defendant, and declaratory relief.

## II. PARTIES

18. Plaintiff Dylan Wohnhas is and at all times mentioned herein was an individual citizen of the State of Maryland. Plaintiff Wohnhas received notice of the Data Breach dated October 2, 2025, attached as Exhibit A.

19. Like Plaintiff, other potential Class members received similar notices informing them that their PII was exposed in the Data Breach on or about October 2, 2025.

20. Defendant, The Rasevic Companies, is a Maryland corporation with its principal place of business at 9746 Doctor Perry Road, Ijamsville, Maryland, 21754.

21. According to its website, Defendant family of companies includes Rasevic Snow Services, Inc., Rasevic Landscape Company and Rasevic Construction Company.[6] Rasevic serves "the greater Washington DC area as well as Northern VA cities like Arlington and Fairfax for snow removal, landscape services and custom home construction."[7]

22. For the purposes of this Class Action Complaint, all of Defendant's associated

[6] https://rasevic.com/contact/ (last visited October 8, 2025).
[7] https://rasevic.com/about/ (last visited October 8, 2025).

companies will be referred to collectively as "Defendant."

## III. JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Rasevic. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

24. This Court has general jurisdiction over Rasevic because Rasevic is registered to conduct business in Maryland and maintains its headquarters in this District.

25. This Court has specific personal jurisdiction over Rasevic because Rasevic has availed itself of the rights and benefits of the State of Maryland, including by (1) providing services in this District, (2) conducting substantial business in this District, and (3) perpetuating unlawful acts in this District.

26. Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because a substantial part of the events giving rise to this action occurred in this District, and Defendant caused harm to Class Members residing in this District.

## IV. FACTUAL ALLEGATIONS

### *Defendant's Business*

27. Defendant Rasevic is a family of companies serving "the greater Washington DC area as well as Northern VA cities like Arlington and Fairfax with services including snow removal, landscape services and custom home construction.

28. In the ordinary course of receiving products and services from Defendant, each customer must provide (and Plaintiff did provide) Defendant with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;
- Social Security number;
- Demographic information;
- Driver's license or state or federal identification; and
- Banking and/or credit card information.

29. Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiff and Class members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

30. Yet, through its failure to properly secure Plaintiff's and Class members' Private Information, Defendant failed to meet its own promises of customer privacy.

31. The customer information held by Defendant in its computer system and network included Plaintiff's and Class members' highly sensitive Private Information.

***A. The Data Breach***

32. A data breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

33. According to Defendant's Notice, it learned of a cyberattack on its computer systems on or about April 2, 2025, when it "determined that some of our files may have been accessed or removed by the unauthorized individual(s) between March 28, 2025, and April 2, 2025."[8]

34. Suspicious activity was identified within its network on April 2, 2025, with the third-party forensic investigation confirming that an unauthorized actor had access to its network

[8] *See* nn.2, 3, *supra*.

between approximately March 28, 2025, and April 2, 2025. During that time, files were exfiltrated from its network, some of which contained customer data. The file review confirmed that the types of data compromised in the cyberattack included names, addresses, dates of birth, Social Security numbers and financial information.

35. However, despite being aware since April 2, 2025, that it was subject of a data breach, Rasevic failed to disclose the cybercriminal's identity or whether it paid a ransom. Nor has it explained why it waited for nearly six months after discovery before notifying affected participants, such as Plaintiffs and other Class members.

36. On information and belief, Plaintiffs' and Class members' stolen Private Information has now been published by cybercriminals to the Dark Web as that is the *modus operandi* of ransomware attackers.[9]

37. As the Harvard Business Review notes, "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[10]

38. Companies in the construction industry, such as Rasevic, have been warned about the increasing trend of hacking attacks on technology systems. Companies have been advised to develop a comprehensive cybersecurity strategy to mitigate the risks posed by cyberattacks.

39. Based on the value of its customers' and employees' PII to cybercriminals and cybercriminals' propensity to target businesses, Rasevic certainly knew the foreseeable risk of

---

[9] https://www.paloaltonetworks.com/cyberpedia/what-is-multi-extortion-ransomware (Typically, in a ransomware attack, the criminal actor will not only encrypt the victim's system and block access until a ransom is paid but also exfiltrate data and threaten to release it to the dark web if a ransom is not paid. This scheme is known as a double-extortion attack. This scheme is used because many "organizations overcome the threat of file encryption with a simple up-to-date backup system.").

[10] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

failing to implement adequate cybersecurity measures.

40. On or about October 2, 2025, months after Defendant learned that Plaintiff's and Class members' Private Information was attacked by cybercriminals, Defendant's customers began receiving their notices of the Data Breach informing them that its investigation determined that their Private Information was accessed.

41. Defendant's notice letters list time-consuming, generic steps that victims of data security incidents can take, such as getting a copy of a credit report or notifying law enforcement about suspicious financial account activity. Also, Plaintiff would have to affirmatively sign up for and a call center number that victims may contact with questions. Defendant offered one year of credit monitoring for members of the class and Defendant offered no other substantive steps to help victims like Plaintiff and Class members to protect themselves. On information and belief, Defendant sent a similar generic letter to all other individuals affected by the Data Breach.

42. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

43. Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

44. Defendant had obligations created by the FTCA, contract, industry standards, common law, and representations made to Plaintiff and Class members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

45. Plaintiff and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

### *B. The Data Breach was a Foreseeable Risk of which Defendant was on Notice.*

46. It is well known that Private Information, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including Defendant, are well-aware of the risk of being targeted by cybercriminals.

47. Individuals place a high value on the privacy of their Private Information. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

48. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, , or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[11]

49. Individuals, like Plaintiff and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing one's DNA for hacker's purposes.

50. Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being

[11] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited October 8, 2025).

misused, Plaintiff and Class members cannot obtain new numbers unless they become a victim of Social Security number misuse.

51. Data Breaches are preventable. Multiple agencies, including the FBI, U.S. Secret Service, U.S. Government Accountability Office, Federal Trade Commission, Social Security Administration, to name a few, have been warning businesses for years to take proactive measures to harden their information networks against hacking. Companies such as Defendant have long been on notice that they are high risk targets and should have taken proactive measures to enhance its data security. Defendant here should have utilized recommended security techniques such as regular backups, robust endpoint security, employee training on phishing awareness and implemented a zero-trust security mode to keep its information network secure.

52. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting its equipment and computer files containing Private Information.

53. As a result of Defendant's inadequate training and supervision of its IT and data security agents and employees, failure to implement reasonable security measures and breach of its legal duties and obligations, the aforementioned Data Breach occurred, and Plaintiffs' and Class Members' Private Information was accessed and "stolen" by an unspecified "bad actor." Defendant permitted Plaintiffs' and Class Members' Private Information to be held in unencrypted form despite the heightened sensitivity of such Private Information.

54. The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting

companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[12]

55. Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches from 2020. Over the next two years, in a poll of security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable cases will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[13]

56. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

57. According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data." [14] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[15]

58. Despite the prevalence of public announcements of data breach and data security

---

[12] https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited October 8, 2025).
[13] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last visited October 8, 2025).
[14] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited October 8, 2025).
[15] *Id.*

compromises, and despite its knowledge of its duties to keep Private Information private and secure, Defendant failed to take appropriate steps to protect Plaintiff's and Class members' Private Information of from being compromised.

59. Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

60. According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[16]

61. The significant increase in attacks in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant.

### *C. Defendant Failed to Comply with FTC Guidelines.*

62. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

63. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct

[16] https://www.ahu.edu/blog/data-security-in-healthcare (last visited October 8, 2025).

any security problems.[17] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[18]

64. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

65. The FTC has brought enforcement actions against businesses, like that of Defendant, for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

66. These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

---

[17] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited October 8, 2025).
[18] *Id.*

67. Defendant failed to properly implement basic data security practices.

68. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

69. Defendant was at all times fully aware of its obligation to protect its customers' Private Information. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *D. Defendant Failed to Comply with Industry Standards.*

70. Several best practices have been identified that a minimum should be implemented by companies like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

71. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

72. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in

reasonable cybersecurity readiness.

73. These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

***E. Defendant Breached its Obligations to Plaintiff and Class.***

74. Defendant breached its obligations to Plaintiff and Class members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its customers' data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect customers' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that vendors with access to Defendant's Private Information employed reasonable security procedures;

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations ;

f. Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding data security, as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of customers' Private Information.

75. As the result of maintaining its computer systems in manner that required security upgrading, inadequate procedures for handling emails containing ransomware or other malignant

computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class members' Private Information.

76. Accordingly, as outlined below, Plaintiff and Class members now face an increased risk of fraud and identity theft.

### *F. Data Breaches Put Consumers at an Increased Risk Of Fraud and Identify Theft*

77. Data Breaches such as the one Plaintiff and Class members experienced cause significant disruption to the overall daily lives of victims affected by the attack.

78. In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[19] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

79. The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

80. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove

[19] https://www.gao.gov/assets/gao-19-230.pdf (last visited October 8, 2025).

fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[20]

81. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

82. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

83. Theft of Private Information is also gravely serious. PII/PHI is valuable property.[21]

84. It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to GAO:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

85. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

86. There is a strong probability that the entirety of the stolen information has been

[20] *See* https://www.identitytheft.gov/Steps (last visited October 8, 2025).
[21] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class members must vigilantly monitor their financial and medical accounts for many years to come.

87. As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[22]

88. Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[23] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[24] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

89. Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he

[22] https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf at 2 (citations omitted) (last visited October 8, 2025).
[23] *Identity Theft and Your Social Security Number*, Social Security Administration (last visited October 8, 2025 ). (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited October 8, 2025).
[24] *Id.* at 4.

credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[25]

90. This data, as one would expect, commands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[26]

91. In recent years, the construction industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## V. PLAINTIFF'S EXPERIENCES

### *G. Plaintiff Dylan Wohnhas*

92. Plaintiff Wohnhas is and was Defendant's customer at all times relevant to this Complaint. Plaintiff Wohnhas received a Notice of Data Incident Letter, related to Defendant's Data Breach, dated October 2, 2025. *See* Exhibit A.

93. The Notice Letter that Plaintiff received does not explain exactly which parts of his Private Information were accessed and taken but instead generically states that the files contained his name and Social Security number.

94. Plaintiff Wohnhas is especially alarmed by the vagueness in the Notice Letter

[25] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited October 8, 2025 ).

[26] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited October 8, 2025 ).

regarding his stolen extremely sensitive Private Information, as among the breached data on Defendant's computer system.

95. Since the Data Breach, Plaintiff Wohnhas has tried to mitigate the damage by changing his passwords, contacting the credit bureaus as Defendant instructed, and monitoring his financial accounts for about 2 and a half hours per week. This is more time than he spent prior to learning of the Defendant's Data Breach. Having to do this every week not only wastes his time as a result of Defendant's negligence, but it also causes him great anxiety.

96. Soon after the Data Breach, Plaintiff Wohnhas began receiving an excessive number of spam calls on the same cell phone number provided to Defendant on his records. These calls are a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that the calls are related to his stolen Private Information.

97. Plaintiff Wohnhas is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

98. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

99. Plaintiff has experienced anxiety and increased concerns arising from the fact that his PII has been or will be misused and from the loss of his privacy.

100. The risk is not hypothetical. Here, a known hacking group intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive information, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

101. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Future identity theft monitoring is reasonable and necessary, and will include future costs and expenses.

102. Plaintiff has a continuing interest in ensuring that his Private Information which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

103. Had Plaintiff Wohnhas been aware that Defendant's computer systems were not secure, he would not have entrusted Defendant with his Private Information.

## VI. PLAINTIFF'S AND CLASS MEMBERS' COMMON INJURIES

104. To date, Defendant has done absolutely nothing to compensate Plaintiff and Class members for the damages they sustained in the Data Breach.

105. Defendant offered only one year of credit monitoring to class members.

106. Defendant fails to offer any compensation to victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

107. Furthermore, Defendant's failure to safeguard Plaintiff's and Class members' Private Information, places the burden squarely on Plaintiff and the Class, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts and omissions resulting in the Data Breach. Defendant merely sent instructions to Plaintiff and Class members about actions they can affirmatively take to protect themselves.

108. Plaintiff and Class members have been damaged by the compromise and exfiltration, by cyber-criminals, of their Private Information as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

109. Plaintiff and Class members were damaged in that their Private Information is now in the hands of cyber criminals being sold and potentially for sale for years into the future.

110. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft, especially in light of the actual fraudulent misuse of the Private Information that has already taken place, as alleged herein.

111. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have been forced to expend time dealing with the effects of the Data Breach.

112. Plaintiff and Class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

113. Plaintiff and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class members.

114. Plaintiff and Class members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

115. Plaintiff and Class members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

116. Plaintiff and Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Monitoring their medical records for fraudulent charges and data;

e. Addressing their inability to withdraw funds linked to compromised accounts;

f. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g. Placing "freezes" and "alerts" with credit reporting agencies;

h. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i. Contacting financial institutions and closing or modifying financial accounts;

j. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l. Closely reviewing and monitoring bank accounts and credit reports for

unauthorized activity for years to come.

117. Moreover, Plaintiff and Class members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

118. Further, as a result of Defendant's conduct, Plaintiff and Class members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

119. Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of Private Information. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach ***since April 2, 2025*** and did not notify the victims until October 2, 2025. Yet Defendant offered no explanation of purpose for the delay. This delay violates notification requirements and increased the injuries to Plaintiff and Class.

## VII. CLASS ACTION ALLEGATIONS

120. Plaintiff brings this action on his own behalf and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23.

121. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was compromised as a result of the Data Breach that is the subject of the Notice of Data Breach published by Defendant on or about October 2, 2025 (the "Class" or "Class members").

122. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

123. This proposed Class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the Class definition in an amended pleading or when he moves for Class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

124. **Numerosity – Fed. R. Civ. P. 23(a)(1)**: Plaintiff is informed and believes, and thereon alleges, that there are at minimum, over a thousand members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Rasevic's records, including but not limited to the files implicated in the Data Breach.

125. **Commonality – Fed. R. Civ. P. 23(a)(2):** This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a. Whether Rasevic had a duty to protect Plaintiff's and Class members' PII;

b. Whether Rasevic was negligent in collecting and storing Plaintiff's and Class members' PII, and breached its duties thereby;

c. Whether Rasevic breached its fiduciary duty to Plaintiff and the Class;

d. Whether Rasevic breached its duty of confidence to Plaintiff and the Class;

e. Whether Rasevic violated its own Privacy Practices;

f. Whether Rasevic entered a contract implied in fact with Plaintiff and the Class;

g. Whether Rasevic breached that contract by failing to adequately safeguard Plaintiff's and Class members' PII;

h. Whether Rasevic was unjustly enriched;

i. Whether Plaintiff and Class members are entitled to damages as a result of Rasevic's wrongful conduct; and

j. Whether Plaintiff and Class members are entitled to restitution as a result of Rasevic's wrongful conduct.

126. **Typicality – Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class all had information stored in Rasevic's System, each having their PII exposed and/or accessed by an unauthorized third party.

127. **Adequacy of Representation – Fed. R. Civ. P. 23(a)(3)**: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex Class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

128. **Injunctive Relief, Fed. R. Civ. P. 23(b)(2):** Defendant has acted and/or refused to act on grounds that apply generally to the Class therefore making injunctive and/or declarative relief appropriate with respect to the Class under 23(b)(2).

129. **Superiority, Fed. R. Civ. P. 23(b)(3):** A Class action is superior to other available

methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Rasevic. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

130. Rasevic has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

131. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Rasevic failed to timely and adequately notify the public of the Data Breach;

b. Whether Rasevic owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c. Whether Rasevic's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Rasevic's failure to institute adequate protective security measures amounted to negligence;

e. Whether Rasevic failed to take commercially reasonable steps to safeguard consumers' and employees' PII; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

132. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

## COUNT I

**Negligence**

(On Behalf of Plaintiff and Class Members)

133. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

134. Defendant required Plaintiff and Class members to submit non-public personal information in order to obtain services and/or employment.

135. By collecting and storing this data in Defendant's computer network and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

136. Defendant owed a duty of care to Plaintiff and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure

that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

137. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its customers, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a Data Breach.

138. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

139. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

140. Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class members' Private Information;

e. Failing to detect in a timely manner that Class members' Private Information had been compromised; and

f. Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

141. It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' Private Information would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

142. It was therefore foreseeable that the failure to adequately safeguard Class members' Private Information would result in one or more types of injuries to Class members.

143. Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

144. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class members in an unsafe and unsecure manner.

145. Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class members.

## COUNT II
**Breach of Implied Contract**
(On Behalf of Plaintiff and Class Members)

146. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

147. When Plaintiff and Class members provided their Private Information to Defendant in exchange for Defendant's products and/or services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

148. Defendant solicited, offered, and invited Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class members accepted Defendant's offers and provided their Private Information to Defendant.

149. In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

150. Plaintiff and Class members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

151. Plaintiff and Class members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

152. Plaintiff and Class members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

153. Plaintiff and Class members fully and adequately performed their obligations under the implied contracts with Defendant.

154. Defendant breached its implied contracts with Class members by failing to safeguard and protect their Private Information.

155. As a direct and proximate result of Defendant's breach of the implied contracts,

Class members sustained damages as alleged herein, including the loss of the benefit of the bargain.

156. Plaintiff and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

157. Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class members.

**COUNT III**
**Unjust Enrichment**
(On Behalf of Plaintiff and Class Members)

158. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

159. Plaintiff brings this claim individually and on behalf of all Class members.

160. This Claim is pleaded in the alternative to Count II above.

161. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class members.

162. As such, a portion of the payments made by or on behalf of Plaintiff and the Class members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

163. Plaintiff and Class members conferred a monetary benefit on Defendant. Specifically, they purchased goods and  from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiff and Class members should have

received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

164. Defendant knew that Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class members for business purposes.

165. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

166. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

167. Defendant failed to secure Plaintiff's and Class members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiff and Class members provided.

168. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

169. If Plaintiff and Class members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

170. Plaintiff and Class members have no adequate remedy at law.

171. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members.

172. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm.

173. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class members overpaid for Defendant's .

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dylan Wohnhas, on behalf of himself and all others similarly

situated, pray for relief as follows:

a) For an Order certifying this action as a Class action and appointing Plaintiff as a Class Representative and his counsel as Class Counsel;

b) For equitable relief enjoining Rasevic from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class members;

c) For equitable relief compelling Rasevic to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Rasevic's wrongful conduct;

e) Ordering Rasevic to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of punitive damages, as allowable by law;

h) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i) Pre- and post-judgment interest on any amounts awarded; and,

j) Such other and further relief as this court may deem just and proper.

## IX. JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 8, 2025

Respectfully submitted,

*/s/Sonjay Singh*
Sonjay Singh (Bar No. 2106150137)
Tyler J. Bean *
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ssingh@sirillp.com
E: tbean@sirillp.com

Liberato P. Verderame*
Marc H. Edelson*
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
T: (215) 867-2399
medelson@edelson-law.com
lverderame@edelson-law.com

*Attorneys for Plaintiffs and the Putative Class*

* Pro hac vice forthcoming

# Exhibit "A"

**THE RASEVIC COMPANIES**

P.O. Box 989728
West Sacramento, CA 95798-9728

Enrollment Code: 6PRF74TJ6G
Enrollment Deadline: January 2, 2026

To Enroll, Scan the QR Code Below:

SCAN ME

Or Visit:
https://app.idx.us/account-creation/protect

Dylan Wohnhas
[redacted]

October 2, 2025

***IMPORTANT INFORMATION PLEASE REVIEW CAREFULLY***

Dear Dylan Wohnhas:

The privacy and security of the personal information we maintain is of the utmost importance to The Rasevic Companies. We are writing to provide you with information regarding a recent cybersecurity incident that potentially involved your personal information. Please read this notice carefully, as it provides information about the incident, the complimentary identity monitoring services we are making available to you, and other precautionary measures you can take to protect your information.

*What Happened?*
On or about April 2, 2025, Rasevic Companies observed a network disruption event wherein an unauthorized actor gained access to our network.

*What We Are Doing.*
Upon learning of the issue, we secured our network and commenced a prompt and thorough investigation. As part of our investigation, we have been working very closely with external cybersecurity professionals experienced in handling these types of incidents. Following the completion of our investigation, it was determined that some of our files may have been accessed or removed by the unauthorized individual(s) between March 28, 2025, and April 2, 2025. We conducted a thorough review of the potentially impacted data and on September 2, 2025, we determined that the impacted files may have contained your personal information.

*What Information Was Involved?*
The information that may have been accessed contained some of your personal information, including your name and Social Security number.

*What You Can Do.*
**We have no evidence that any of your information has been used to commit financial fraud or identity theft as a result of this incident.** Nevertheless, out of an abundance of caution, we want to make you aware of the incident and provide complimentary credit monitoring services as a precaution. In addition, we are offering identity theft protection services through IDX, the data breach and recovery services expert. IDX identity protection services include: 12 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed id theft recovery services. With this protection, IDX will help you resolve issues if your identity is compromised. This letter also provides other precautionary measures you can take to protect your personal information, including placing a Fraud Alert and Security Freeze on your credit files, and obtaining a free credit report. Additionally, you should always remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity on a regular basis.

001029

## – OTHER IMPORTANT INFORMATION –

1. **Complimentary Credit Monitoring and Identity Theft Protection.**

**Website and Enrollment.** Scan the QR image or go to https://app.idx.us/account-creation/protect and follow the instructions for enrollment using your Enrollment Code provided at the top of the letter.

**Activate the credit monitoring** provided as part of your IDX identity protection membership. The monitoring included in the membership must be activated to be effective. Note: You must have established credit and access to a computer and the internet to use this service. If you need assistance, IDX will be able to assist you.

**Telephone.** Contact IDX at 1-833-788-9712 to gain additional information about this event and speak with knowledgeable representatives about the appropriate steps to take to protect your credit identity.

If you discover any suspicious items and have enrolled in IDX identity protection, notify them immediately by calling or by logging into the IDX website and filing a request for help. If you file a request for help or report suspicious activity, you will be contacted by a member of the IDX ID Care team who will help you determine the cause of the suspicious items. In the unlikely event that you fall victim to identity theft as a consequence of this incident, you will be assigned an ID Care Specialist who will work on your behalf to identify, stop and reverse the damage quickly.

2. ***Placing a Fraud Alert.***

We recommend that you place a one-year "Fraud Alert" on your credit files, at no charge. A fraud alert tells creditors to contact you personally before they open any new accounts. To place a fraud alert, call any one of the three major credit bureaus at the numbers listed below. As soon as one credit bureau confirms your fraud alert, they will notify the others.

***Equifax***
P.O. Box 105069
Atlanta, GA 30348-5069
www.equifax.com/personal/credit-report-services/credit-fraud-alerts/
(888) 378-4329; (800) 525-6285

***Experian***
P.O. Box 9554
Allen, TX 75013
www.experian.com/fraud/center.html
(888) 397-3742

***TransUnion***
Fraud Victim Assistance Department
P.O. Box 2000
Chester, PA 19016
www.transunion.com/fraud-alerts
(800) 916-8800; 800-680-7289

3. **Consider Placing a Security Freeze on Your Credit File.**

If you are very concerned about becoming a victim of fraud or identity theft, you may request a "Security Freeze" be placed on your credit file at no cost. A security freeze prohibits, with certain specific exceptions, the consumer reporting agencies from releasing your credit report or any information from it without your express authorization. You may place a security freeze on your credit report by sending a request in writing, by mail, to all three nationwide credit reporting companies. To find out more on how to place a security freeze, you can use the following contact information:

***Equifax Security Freeze***
P.O. Box 105788
Atlanta, GA 30348-5788
www.equifax.com/personal/credit-report-services/credit-freeze/
(888) 298-0045; (800) 685-1111

***Experian Security Freeze***
P.O. Box 9554
Allen, TX 75013
www.experian.com/freeze/center.html
(888) 397-3742

***TransUnion Security Freeze***
P.O. Box 160
Woodlyn, PA 19094
www.transunion.com/credit-freeze
(800) 916-8800; (888) 909-8872

In order to place the security freeze, you will need to supply your name, address, date of birth, Social Security number and other personal information such as copy of a government issued identification. After receiving your freeze request, each credit reporting company will send you a confirmation letter containing a unique PIN (personal identification number) or password. Keep the PIN or password in a safe place. You will need it if you choose to lift the freeze. If you do place a security freeze prior to enrolling in a credit monitoring service, you will need to remove the freeze in order to sign up for the credit monitoring service. After you sign up for the credit monitoring service, you may refreeze your credit file.

4. **Obtaining a Free Credit Report.**

Under federal law, you are entitled to one free credit report every 12 months from each of the above three major nationwide credit reporting companies. Call **1-877-322-8228** or request your free credit reports online at **www.annualcreditreport.com**. Once you receive your credit reports, review them for discrepancies. Identify any accounts you did not open or inquiries from creditors that you did not authorize. Verify all information is correct. If you have questions or notice incorrect information, contact the credit reporting company.

5. **Protecting Your Medical Information.**

If this notice letter indicates that your medical information was impacted, we have no information to date indicating that your medical information involved in this incident was or will be used for any unintended purposes. As a general matter, however, the following practices can help to protect you from medical identity theft.

- Only share your health insurance cards with your health care providers and other family members who are covered under your insurance plan or who help you with your medical care.
- Review your "explanation of benefits statement" which you receive from your health insurance company. Follow up with your insurance company or care provider for any items you do not recognize. If necessary, contact the care provider on the explanation of benefits statement and ask for copies of medical records from the date of the potential access (noted above) to current date.
- Ask your insurance company for a current year-to-date report of all services paid for you as a beneficiary. Follow up with your insurance company or the care provider for any items you do not recognize.

6. **Additional Helpful Resources.**

Even if you do not find any suspicious activity on your initial credit reports, the Federal Trade Commission (FTC) recommends that you check your credit reports periodically. Checking your credit report periodically can help you spot problems and address them quickly. If you find suspicious activity on your credit reports or have reason to believe your information is being misused, call your local law enforcement agency and file a police report. Be sure to obtain a copy of the police report, as many creditors will want the information it contains to absolve you of the fraudulent debts. You may also file a complaint with the FTC by contacting them on the web at www.ftc.gov/idtheft, by phone at 1-877-IDTHEFT (1-877-438-4338), or by mail at Federal Trade Commission, Consumer Response Center, 600 Pennsylvania Avenue, NW, Washington, DC 20580. Your complaint will be added to the FTC's Identity Theft Data Clearinghouse, where it will be accessible to law enforcement for their investigations. In addition, you may obtain information from the FTC about fraud alerts and security freezes.

**Iowa Residents:** You may contact law enforcement or the Iowa Attorney General's Office to report suspected incidents of identity Theft: Office of the Attorney General of Iowa, Consumer Protection Division, Hoover State Office Building, 1305 East Walnut Street, Des Moines, IA 50319, www.iowaattorneygeneral.gov, Telephone: 515-281-5164.

**Maryland Residents:** You may obtain information about avoiding identity theft from the Maryland Attorney General's Office: Office of the Attorney General of Maryland, Consumer Protection Division, 200 St. Paul Place, Baltimore, MD 21202, www.marylandattorneygeneral.gov, Telephone: 888-743-0023.

**Massachusetts Residents:** Under Massachusetts law, you have the right to obtain a police report in regard to this incident. If you are the victim of identity theft, you also have the right to file a police report and obtain a copy of it.

**New Mexico residents:** You have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in your credit file has been used against you, the right to know what is in your credit file, the right to ask for your credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to your file is limited; you must give your consent for credit. In addition, you have the right to obtain a security freeze (as explained above) or submit a declaration of removal. You have a right to bring a civil action against a consumer reporting agency that violates your rights under the Fair Credit Reporting and Identity Security Act. For more information about the FCRA, please visit www.consumer.ftc.gov/sites/default/files/articles/pdf/pdf-0096-fair-credit-reporting-act.pdf or www.ftc.gov.

**New York Residents:** You may obtain information about preventing identity theft from the New York Attorney General's Office: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; ag.ny.gov/consumer-frauds-bureau/identity-theft; Telephone: 800-771-7755.

**North Carolina Residents:** You may obtain information about preventing identity theft from the North Carolina Attorney General's Office: Office of the Attorney General of North Carolina, Consumer Protection Division, 9001 Mail Service Center, Raleigh, NC 27699-9001, www.ncdoj.gov, Telephone: 877-566-7226 (Toll-free within North Carolina), 919-716-6000.

**Oregon Residents:** You may obtain information about preventing identity theft from the Oregon Attorney General's Office: Oregon Department of Justice, 1162 Court Street NE, Salem, OR 97301-4096, www.doj.state.or.us, Telephone: 877-877-9392.

**Rhode Island Residents:** You have the right to obtain a police report if one was filed, or alternatively, you can file a police report. Further, you can obtain information from the Rhode Island Office of the Attorney General about steps you can take to help prevent identity theft. 150 South Main Street, Providence, RI 02903, (401) 274-4400, www.riag.ri.gov. If you are a victim of identity theft, a copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft. There were 0 Rhode Island residents impacted.

**Washington D.C. Residents:** You may obtain information about preventing identity theft from the Office of the Attorney General for the District of Columbia, 400 6th Street NW, Washington D.C. 20001, oag.dc.gov/consumer-protection, Telephone: 202-442-9828.

We encourage you to contact IDX with any questions and to enroll in free identity protection services by calling 1-833-788-9712, going to https://app.idx.us/account-creation/protect, or scanning the QR image and using the Enrollment Code provided above. IDX representatives are available Monday through Friday from 9 a.m. to 9 p.m. Eastern Time. Please note, the deadline to enroll is January 2, 2026.

*For More Information.*
Should you have questions, please contact our dedicated response line at 1-833-788-9712 or go to https://app.idx.us/account-creation/protect for assistance. Our response line is available Monday through Friday, between the hours of 9 a.m. to 9 p.m. Eastern Time. We apologize for any inconvenience or concern this may cause. We have taken this matter very seriously and will continue to take significant measures to protect the personal information in our possession.

Sincerely,
The Rasevic Companies
9746 Dr Perry Rd,
Ijamsville, MD 21754